# TAX COURT OF NEW JERSEY



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

November 10, 2025

Steven Siegel, Esq.
Leon J. Sokol, Esq.
Cullen and Dykman LLP
433 Hackensack Avenue
Hackensack, New Jersey 07601

Lauren M. Manduke, Esq.
Geoffrey N. Weinstein, Esq.
Cole Schotz, P.C.
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800

> Re:    Michael Giammarino and Roseann Giammarino v. Dir., Div. of Taxation
>        Docket No. 001040-2024

Dear Counsel:

This letter shall constitute the court's opinion on the New Jersey Office of Legislative Services' ("OLS") motion seeking to quash the Subpoena Duces Tecum and Ad Testificandum served on Gabriel R. Neville, Esq., Legislative Counsel to the OLS, dated March 7, 2025, under R. 1:9-2 ("motion to quash").[1]

For the reasons explained more fully below, the motion to quash is granted, in part, and denied, in part.

### I.    Procedural History and Findings of Fact

On July 7, 2025, this court authored an opinion outlining the factual history in this matter

---

[1] Under letter dated October 20, 2025, defendant, Director of the New Jersey Division of Taxation (defendant) advised the court that defendant does not oppose the motion filed by the OLS.






and the allegations raised by plaintiffs under their complaint. The factual history set forth in the court's July 7, 2025 opinion is incorporated herein, as if set forth fully at length. However, a summary of the relevant facts is provided below.

On January 9, 2018, February 5, 2018, and April 5, 2018, Senate Bill Nos. S. 64/S. 1515/S. 2407 were introduced in the New Jersey State Senate. On February 8, 2018, Assembly Bill No. 3088 was introduced in the New Jersey Assembly.[2] In total, the pieces of legislation proposed several modifications and amendments to the New Jersey Gross Income Tax Act, N.J.S.A. 54A:1-1 to 12-6 (the "New Jersey Gross Income Tax Act").

On May 8, 2018, in two separate commercial transitions, Michael and Roseann Giammarino ("plaintiffs"), sold certain equity interests that they had in Ferraro Foods, Inc. (Ferraro), generating capital gains of approximately $316,388,583.

On or about June 30, 2018, Governor Phil Murphy conditionally vetoed A. 3088. In conditionally vetoing the legislation, Governor Murphy expressed that he "had some problems with the revenue side of the Legislature's original Fiscal Year 2019 budget." Governor's Recommendations for Reconsideration Statement to Assembly Committee Substitute for Assembly Bill No. 3088 (June 30, 2018) (P.L. 2018, Chapter 45), available at https://pub.njleg.state.nj.us/Bills/2018/A3500/3088_V1.PDF. In returning A. 3088 to the New Jersey Legislature for reconsideration the Governor proposed, "a modest increase in the income tax for multi-millionaires to ensure that all New Jerseyans begin to pay a fair share to support important investments like those included in this bill." Ibid. His proposed change would increase

---

[2] On June 18, 2018, A. 3088 was combined with S.64/S.1515/S.2407 as "Substitute for Assembly, No. 3088," in the New Jersey State Senate and adopted by the New Jersey Assembly Budget Committee (A. 3088 and Substitute for Assembly, No. 3088 shall be collectively referred to herein as "A. 3088.")






the tax rate on income over $5,000,000 from 8.97% to 10.75%. Specifically, the Governor's

Recommendations for Reconsideration Statement to Assembly Committee Substitute for

Assembly Bill No. 3088 proposed enacting the following amendments to N.J.S.A. 54A:2-1:

> Imposition of tax. 54A:2-1. Imposition of tax. There is hereby imposed a tax for each taxable year (which shall be the same as the taxable year for federal income tax purposes) on the New Jersey gross income as herein defined of every individual, estate or trust (other than a charitable trust or a trust forming part of a pension or profit-sharing plan), subject to the deductions, limitations and modifications hereinafter provided, determined in accordance with the following tables with respect to taxpayers' taxable income:
>
> a. For married individuals filing a joint return and individuals filing as head of household or as surviving spouse for federal income tax purposes:
>
> . . .
>
> (6) for taxable years beginning on or after January 1, 2018:
>
> If the taxable income is:      The tax is:
>
> . . .
>
> Over $5,000,000.00    $431,457.50 plus 10.75% of the excess over $5,000,000.00.

On July 1, 2018, Governor Murphy's proposed amendments to A. 3088 passed the New

Jersey Senate and General Assembly. On July 1, 2018, Governor Murphy signed A. 3088 into law.

However, of particular significance in this matter, A. 3088 as enacted, provided that "[t]his act

shall take effect immediately and shall apply to taxable years beginning on and after January 1,

2018. . . ." Thus, capturing the approximate $316,388,583 in capital gains generated from

plaintiffs' sale of their equity interests in Ferraro.

On or about October 15, 2019, plaintiffs filed their 2018 NJ-1040, New Jersey Resident

Income Tax Return, reporting a net gain or income from the disposition of property of






$309,888,583.  Plaintiffs remitted the 10.75% tax on their New Jersey Gross Income.

On or about October 7, 2020, plaintiffs filed a 2018 NJ-1040X, New Jersey Amended Resident Income Tax Return ("2018 Amended Return"), seeking a "$5,518,184 refund based upon the retroactive application of a 10.75% rate to [p]laintiffs' income in excess of $5 million."

On or about June 30, 2021, the Director of the New Jersey Division of Taxation (the "Director") denied plaintiffs' refund claim.[3]

On February 26, 2024, plaintiffs filed a complaint challenging the Director's denial. Plaintiffs' complaint asserts that a refund is being sought for "the difference in tax (plus interest) between the 8.97% tax rate that was in effect at the time of the [May 8, 2018] [t]ransactions and the 10.75% tax rate that became law after the [t]ransactions but applied retroactively."

On or about March 7, 2025, plaintiffs' counsel issued a non-party Subpoena Duces Tecum and Ad Testificandum (the "Subpoena") to Gabriel R. Neville, Esq. ("Mr. Neville"), Legislative Counsel to the OLS.  The Subpoena sought testimony from Mr. Neville and directed the OLS to produce the following documents:

> 1.  All documents that refer or relate to any communications regarding Plaintiffs.
>
> 2.  All documents that refer or relate to N.J.S.A. § 54A:2-l(a)6 and (b)6.
>
> 3.  All documents and communications that refer or relate to the July 1, 2018 amendment to N.J.S.A. § 54A:2-1, made effective retroactively to January 1, 2018.
>
> 4.  All documents that refer or relate to any communications and/or discussions regarding N.J.S.A. 54A:2-l(a)6 and (b)6.

---

[3]  Plaintiffs filed a timely protest with the Director's Conference and Appeals Branch, and on November 30, 2023, the Director issued a Final Determination letter denying plaintiffs' 2018 New Jersey Gross Income Tax refund claim.





5. All documents that refer or relate to any communications and/or discussions regarding the July 1, 2018 amendment to N.J.S.A. §54A:2-1, made effective retroactively to January 1, 2018 (L. 2018, c. 45, §10, A. 3088).

6. All documents that refer or relate to discussions, communications, statements, and/or decisions regarding enactment of the amendment to N.J.S.A. § 54A:2-l(a)6 and (b)6.

7. All documents that refer or relate to discussions, communications, statements, and/or decisions regarding applying the amendment to N.J.S.A. § 54A:2-1 retroactively to January 1, 2018.

8. All documents that refer or relate to the legislative history of the amendment to N.J.S.A. § 54A:2-1.

9. All documents that refer or relate to internal memorandums, discussions, communication, and /or statements between You and any member of the New Jersey State legislature regarding the amendment to N.J.S.A. § 54A:2-1.

10. All documents and communications that refer or relate to the OLS estimate that the increase in the marginal tax rate for income over $5 million from 8.97 percent to 10.75 percent, as enacted in (L. 2018, c. 45, § 10, A. 3088), may yield additional gross income tax revenue of $293.7 million to $312.0 million in fiscal year 2019. Reference is made to the Legislative Fiscal Estimate, page 3.

11. All documents and communications that refer or relate to the OLS estimate of additional gross tax revenue that is derived from the 2015 data from the Statistics of Income published annually by the Department of the Treasury. Reference is made to the Legislative Fiscal Estimate, pages 3-4.

12. All documents and communications that refer or relate to Your statement in the Legislative Fiscal Estimate that 'incomes and tax liabilities for taxpayers at very high levels of income are subject to significant volatility from year to year because high-income taxpayers are more dependent on income sources that are more susceptible to changes in the economy, such as capital gains, employment bonuses, and certain types of business income.' Reference is made to the Legislative Fiscal Estimate, page 4

Under letter dated March 28, 2025, the Assistant Legislative Counsel for the OLS






responded to plaintiffs' counsel's Subpoena stating, in part, that

> [T]he documents you have requested are covered by legislative privilege. The Speech or Debate Clause of the New Jersey Constitution states:
>
> > Members of the Senate and General Assembly shall, in all cases except treason and high misdemeanor, be privileged from arrest during their attendance at the sitting of their respective houses, and in going to and returning from the same; and for any statement, speech or debate in either house or at any meeting of a legislative committee, they shall not be questioned in any other place. [N.J. Const. Art. IV, § 4, ¶ 9.]
>
> In light of the above, the Legislature through OLS will not be releasing the documents you have requested. The denial is in keeping with the general principles of legislative privilege.

Under response dated September 23, 2025, plaintiffs' counsel rejected the OLS' position and demanded that the OLS produce, "at a minimum, a privilege log" by September 30, 2025.

On September 30, 2025, the OLS filed the instant motion seeking to quash the Subpoena. In support of its motion, the OLS emphasizes that it "is established in the Legislative Branch of the State Government, to aid and assist the Legislature in performing its functions." The OLS maintains that the "New Jersey Constitution's Speech or Debate Clause precludes discovery in private civil litigation against members of the Legislature when the plaintiff is seeking to compel production of non-public legislative documents." It argues that the Subpoena seeks disclosure of non-public documents that "relate to" the enactment of the amendments to N.J.S.A. 54A:2-1. As such, "all of the aforementioned requested non-public documents [under the Subpoena] are within the scope of legislative immunity and privilege afforded by the Speech or Debate Clause." Accordingly, the OLS charges that the "Subpoena should be quashed in its entirety."

In response to the motion, plaintiffs maintain that the Speech or Debate Clause immunity






is not an absolute "blanket privilege." Rather, to enjoy the protections afforded under the Speech or Debate Clause, the conduct of the legislator "must be an 'integral part of the deliberative and communicative process.'" Thus, plaintiffs maintain that the court must engage in a "fact-specific analysis" to discern if the activity is "'casually or incidentally related to legislative affairs but not a part of the legislative process itself.'" To enable the court to perform this task, plaintiffs contend that the OLS must produce a privilege log or "Vaughn index," that sufficiently demonstrates what documents and information are in its possession and why they are immune from production.

Moreover, plaintiffs contend that the documents and information sought under the Subpoena are narrowly tailored and indisputably relevant to plaintiffs' claims. Plaintiffs argue that the documents and information sought is "limited and specific categories of documents that go to the heart of the adoption of the Amendment and its retroactive application." In sum, plaintiffs assert that "the Subpoena seeks information that is vital to the core issues in this case" and that they cannot obtain this discovery information from any other party or non-party source.[4]

## II. Conclusions of Law

### A. Relevance; Motions to Quash

Our courts apply a standard of substantial liberality in providing access to information, documents and materials, favoring litigants' rights to "broad pretrial discovery." Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 535 (1996) (citing Jenkins v. Rainner 69 N.J. 50, 56 (1976)). See also Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 215-216 (App. Div.

---

[4] On October 22, 2025, the court conducted a telephone conference call in this matter. During that telephone conference call, the court invited counsel to submit supplemental briefs addressing the applicability of the unpublished Tax Court opinion, Harrington v. Dir., Div. of Taxation, 2016 N.J. Tax Unpub. LEXIS 12 (Tax 2016). Plaintiffs' counsel and the OLS' counsel submitted supplemental briefs to the court however, the Director's counsel did not.






1987). In general, a party may obtain material which "appears reasonably calculated to lead to the discovery of admissible evidence" pertaining to the cause of action. In re: Liquidation of Integrity Ins. Co., 165 N.J. 75, 82 (2000). The court rules afford litigants the right to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . ." R. 4:10-2(a).

While not explicitly defined under our court rules, "relevant evidence" is defined as "evidence having any tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. However, the relevancy of documents and materials is not predicated upon their admissibility at trial; instead, it is founded upon whether the information sought is "reasonably calculated to lead to admissible evidence respecting the cause of action or its defense." Pressler & Verniero, Current New Jersey Rules Governing the Courts, comment 1 on R. 4:10-2(a) (2025). Thus, disclosure of inadmissible evidence is nonetheless required "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." R. 4:10-2(a). See also Irval Realty Inc. v. Board of Public Utility Commissioners, 115 N.J. Super. 338, 346 (App. Div. 1971), aff'd, 61 N.J. 366 (1972); Berrie v. Berrie, 188 N.J. Super. 274, 278 (Ch. Div. 1983). Information which bears even a remote relevance to the subject matter of a cause of action is discoverable, if it is reasonably likely to lead to discovery of admissible evidence.

Although pretrial discovery should be liberally granted, its reach is not without limits. As "broad as modern discovery may be, it is not unbridled and not unlimited." Berrie, 188 N.J. Super. at 282. R. 4:10-3 permits a party or a person from whom discovery has been sought, upon a showing of good cause, to make application for entry of an order preventing a party from taking all or certain discovery. The rule provides for the issuance of protective orders, stating in pertinent






part:

> the court . . . may make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including, but not limited to, one or more of the following:
>
> (a) That the discovery not be had;
> (b) That the discovery may be had only on specified terms and conditions, including a designation of the time or place;
> (c) That the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
> (d) That certain matters not be inquired into, or that the scope of the discovery be limited to certain matters[.]
>
> [R. 4:10-3.]

Thus, R. 4:10-3 imposes on the moving party the "burden of persuading the court that good cause exists for issuing the protective order." Kerr v. Able Sanitary and Environmental Services, Inc., 295 N.J. Super. 147, 155 (App. Div. 1996).

Moreover, the use of subpoenas to obtain pre-trial discovery materials, including "books, papers, documents, electronically stored information, or other objects," is subject to the protections afforded under R. 4:10-3 and R. 1:9-2. R. 4:14-7(a). Our rules permit courts to "quash or modify the subpoena . . . if compliance would be unreasonable or oppressive and . . . may condition denial of the motion upon the advancement by the person in whose behalf the subpoena or notice is issued of the reasonable cost of producing the objects subpoenaed." R. 1:9-2. Notably, in gauging the reasonableness of the subpoena, it must seek information that is "specified with reasonable certainty, and there must be a substantial showing that [the subpoenaed materials] contain evidence relevant and material to the issue. If the specification is so broad and indefinite as to be oppressive and in excess of the defendant's necessities, the subpoena is not sustainable." State v. Cooper, 2 N.J. 540, 556 (1949). These "principles that guide our courts in pretrial discovery matters . . .






strive to avoid placing undue burdens upon litigants or imposing unfair conditions upon access to relevant information or potential witnesses." In re Pelvic Mesh/Gynecare Litigation, 426 N.J. Super. 167, 196 (App. Div. 2012).

Here, plaintiffs' complaint charges that the "10.75% tax rate set forth in N.J.S.A. 54A:2-1(a)(6) enacted on July 1, 2018 [under A. 3088] cannot be applied retroactively" to the sale of their interest in Ferraro occurring on May 8, 2018. Plaintiffs further argue that A. 3088's retroactive application to January 1, 2018 is manifestly unjust, discriminatory and violates their due process and equal protection rights under the New Jersey Constitution and the United States Constitution.

Therefore, the court's relevancy considerations must be measured against whether the documents, materials, and testimony sought under the Subpoena have a reasonable likelihood of proving or disproving any fact of consequence under the plaintiffs' manifest injustice or constitutional claims.

Plaintiffs' Subpoena seeks testimony, documents, communications, statements, or internal memorandums from the OLS that: (i) make any reference to plaintiffs; (ii) pertain to A. 3088's amendments to N.J.S.A. 54A:2-1; (iii) reference the retroactive application of N.J.S.A. 54A:2-1; and (iv) reference the estimated revenue that would be derived from A. 3088's amendments to N.J.S.A. 54A:2-1. Moreover, the Subpoena further seeks to ascertain how the OLS' Legislative Budget and Finance Officer (LBFO) calculated the estimated revenue projections for the 2019 fiscal year stemming from the amendments to N.J.S.A. 54A:2-1.[5]

---

[5] In applying the doctrine of manifest injustice, the court's inquiry does not necessarily rise to constitutional considerations, rather the court's decision "look[s] to matters of unfairness and inequity." In re D.C., 146 N.J. 31, 58 (1996). Embodied in this analysis is the taxpayers "reliance on existing law . . . and the unfairness of changing that law. . . ." Ibid. In evaluating these factors, the trial court "must weigh 'the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance.'" Oberhand






It is undisputed that Governor Murphy's veto of A. 3088 proposed specific amendments to N.J.S.A. 54A:2-1(a)(6) by increasing the income tax rate, from 8.97% to 10.75%, on individuals earning annual gross income exceeding $5,000,000. Thus, consideration by the court of plaintiffs' manifest injustice claims would require not only credible evidence of plaintiffs' reliance on the former N.J.S.A. 54A:2-1(a), but evidence of the public interest and necessity for the retroactive application of A. 3088. Accordingly, there is a "logical connection" or likelihood that the documents and information sought under the Subpoena may be probative of a fact of consequence in this matter. State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990). Therefore, the court finds that the documents sought under the Subpoena are relevant, and/or reasonably likely to lead to the discovery of admissible evidence in this matter under R. 4:10-2(a).[6]

However, despite their relevance, the information sought under the Subpoena may nonetheless remain confidential if the OLS can demonstrate that good cause exists for entry of a protective order quashing the Subpoena. When a party seeks to withhold materials that it asserts are privileged, protected, or immune from production, "the party shall make the claim expressly

---

v. Dir., Div. of Taxation, 193 N.J. 558, 572 (2008) (quoting Nelson v. Bd. of Educ. of Old Bridge, 148 N.J. 358, 372 (1997)).

[6] Analyzing plaintiffs due process allegations against these metrics leads the court to conclude that the documents and information sought under the Subpoena are also relevant. The retroactive application of a statute "does not deprive parties of due process if the legislation 'is supported by a legitimate legislative purpose furthered by rational means.'" Nobrega v. Edison Glen Assocs., 167 N.J. 520, 542-43 (2001). However, the burden of demonstrating that the legislative action was arbitrary and irrational is shouldered by the party alleging the due process violation. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976). This invokes the rational basis test and requires consideration of whether the statute "is supported by a legitimate legislative purpose furthered by rational means." Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984). Importantly, the rational basis test requires the court to "answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" W. & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 668 (1981).






and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." R. 4:10-2(e)(1).

Here, the OLS argues that the Subpoena seeks materials and information from the Legislature, and employees of the Legislature, that fall under the province of legislative activities, and therefore, are shielded from disclosure under the Speech or Debate Clause under the New Jersey Constitution.

### A. Office of Legislative Services

The OLS is an agency of the Legislative Branch of our State's government charged with "aid[ing] and assist[ing] the Legislature in performing its functions. . . ." N.J.S.A. 52:11-55. Among the statutorily enumerated duties of the OLS, is to "[p]rovide, upon request, legal, fiscal, research, information and administrative services and assistance for the Legislature, its officers, committees, commissions, members and staff." N.J.S.A. 52:11-58(b)(1). Moreover, the OLS bears responsibility to "[c]ollect, prepare and disseminate to the Legislature, its officers, committees, commissions, members and staff, such information, reports, publications and documents as shall be of concern or interest to or have an impact upon the Legislature or the legislative process." N.J.S.A. 52:11-58(b)(4).

The OLS is governed by the Legislative Services Commission, a sixteen-member bipartisan panel having equal representation from the New Jersey Senate and General Assembly. The OLS consists of an Executive Director, Legislative Counsel, Legislative Budget and Finance Officer, the State Auditor, and a Director of Public Information. N.J.S.A. 52:11-58. The OLS Director of Public Information is responsible for "providing nonpartisan information and information services to the officers and members of the Legislature and to all standing reference,






joint and special committees and commissions of the Legislature." N.J.S.A. 52:11-65.[7]

The OLS staff are nonpartisan employees that provide support services to the Legislature including legislative research, legal advice and opinions, bill drafting, public information services, administrative services, fiscal research, and fiscal note committee staffing. Legislators may directly contact the OLS staff for assistance or submit requests for assistance through the OLS' Central Management Unit.

Here, plaintiffs' Subpoena seeks documents and communications in possession of the OLS related to the amendments enacted under A. 3088 to N.J.S.A. 54A:2-1, including its retroactive application. In addition, plaintiffs' Subpoena seeks documents and information relied upon by the OLS in generating its Legislative Fiscal Estimate, including how the OLS determined that "increasing the marginal gross income tax rate on income over $5 million from 8.97 percent to 10.75 percent may yield between $293.7 million and $312.0 million in additional State revenue" for the 2019 fiscal year. Legislative Fiscal Estimate to Assembly Committee Substitute for A. 3088 1 (September 28, 2018).

In issuing the Subpoena, plaintiffs hope to discover evidence of: (i) any discussions or communications involving the amendments to N.J.S.A. 54A:2-1 including its retroactive application; (ii) whether there were any discussions or communications regarding plaintiffs or plaintiffs sale of their equity interests in Ferraro; (iii) how and from what information were the revenue estimates derived; (iv) whether the revenue estimates included the tax on plaintiffs sale of their equity interests in Ferraro; and (v) what considerations, if any, were given to the public

---

[7] The Director of Public Information is charged with the duty of establishing "standards for the [OLS] in providing information to the public." N.J.S.A. 52:11-66(f). Thus, when enacting Title 52, our Legislature contemplated that certain uniform criteria would be adhered to in gauging what documents and information would and would not be made available to the public.






interests in the retroactive application of the statute.

However, because the OLS is an agency of the Legislative Branch, the documents sought under the Subpoena must be analyzed considering the protections provided under the Speech or Debate Clause of our State's Constitution and the independence afforded to each branch of our government.

      B.    <u>Speech or Debate Clause</u>

"The framers of the 1947 Constitution distributed powers among the three branches of State Government in a fashion that recognizes both the need for, on the one hand, primacy and clarity of governmental functions, but also, on the other hand, the importance of inter-branch accommodation." <u>Commc'ns Workers of Am., AFL-CIO v. Christie</u>, 413 N.J. Super. 229, 256 (App. Div. 2010).

The Speech or Debate Clause under the New Jersey Constitution provides that:

> Members of the Senate and General Assembly shall, in all cases except for treason and high misdemeanor, be privileged from arrest during their attendance at the sitting of their respective houses, and in going to and returning from the same; and for any statement, speech or debate in either house or at any meeting of a legislative committee, they shall not be questioned in any other place.
>
> [<u>N.J. Const.</u> art. IV, § 4, ¶ 9.]

Thus, the Speech or Debate Clause "implicates policy considerations that bear on the very foundation of constitutional government." <u>State v. Twp. of Lyndhurst</u>, 278 N.J. Super. 192, 201 (Law Div. 1994). The Speech or Debate Clause fulfills the critical role embraced by our Constitution to fortify the separation of powers established by ensuring the integrity of our Legislature and that its functions can be independently undertaken.

It "protect[s] the integrity of the legislative process by preventing the 'intimidation of






legislators by the Executive [Branch] and accountability before a possibly hostile judiciary.'" Gilbert v. Gladden, 87 N.J. 275, 292 (1981) (Pashman, J., dissenting) (quoting Gravel v. United States, 408 U.S. 606, 617 (1972)). To achieve this end, the Speech or Debate Clause "assures that the speech and conduct of legislators acting within the sphere of legitimate legislative activity will not be made the basis for a civil judgment." Teamsters Local 97 v. State, 434 N.J. Super. 393, 428 (App. Div. 2014) (citing Gilbert, 87 N.J. at 292-93). The overarching "'purpose of the Speech or Debate Clause is to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process.'" State v. Twp. of Lyndhurst, 278 N.J. Super. at 200 (quoting United States v. Brewster, 408 U.S. 501, 524 (1972)).

In deliberating application of the Speech or Debate Clause immunity, our Supreme Court set forth a two-part test. To qualify for the privilege, the activity must be:

> an integral part of the deliberative and communicative process by which Members participate in committee and [House] proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
>
> [Gilbert, 87 N.J. at 293 (1981) (quoting Gravel, 408 U.S. at 625).]

Thus, for the Speech or Debate Clause immunity to apply, the activity: (i) must be an integral part of deliberative and communicative process that members of the New Jersey Senate and General Assembly engage in during legislative and committee proceedings; and (ii) it must address legislation that is proposed or pending before New Jersey Senate or General Assembly, or is a matter that is within their constitutional jurisdiction.

In discerning what constitutes legitimate legislative activity, our courts have interpreted such phrase as "one 'generally done in [the Legislature] in relation to the business before it.'" State v. Gregorio, 186 N.J. Super. 138, 153 (Law Div. 1982) (quoting United States v. Helstoski,






442 U.S. 477, 488 (1970)).  Moreover, although the Speech or Debate Clause is broadly applied to "[e]nsure the independence of the Legislature," our courts have emphasized that its application cannot "modify[] the constitutional balance of the three co-equal branches of government."  Id. at 152.

Notably, "the immunity of the Speech and Debate Clause is not absolute."  De Vesa v. Dorsey, 134 N.J. 420, 458 (1993) (Handler, J., dissenting); see also Hutchinson v. Proxmire, 443 U.S. 111, 127 (1970) (concluding that "nothing in history or in the explicit language of the [Speech or Debate] Clause suggests any intention to create an absolute privilege from liability     ").  Thus, not every action or activity undertaken by a legislator, nor the legislator's status, are sufficient to convey immunity.  Simply because a member of the Legislative Branch engages in certain conduct or activities does not intrinsically render them legislative.  See Gravel, 408 U.S. at 625 (concluding that "[m]embers of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies -- they may cajole, and exhort with respect to the administration of a federal statute -- but such conduct, though generally done, is not protected legislative activity."); Doe v. McMillan, 412 U.S. 306, 313 (1973) (concluding that "everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause"); United States v. Brewster, 408 U.S. 501, 512 (1972) (concluding that "Members of the Congress engage in many activities other than the purely legislative activities . . . [t]hese include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress . . . Although these are entirely legitimate activities, they are political in nature rather than legislative     "); Davis v. Passman, 442 U.S. 228, 246 (1979) (concluding that when a Congressperson's "actions






are not shielded by the [Speech or Debate] Clause, we apply the principle that 'legislators ought . . . generally to be bound by [the law] as are ordinary persons."); In re Grand Jury Proceedings, 563 F.2d 577, 582 (3rd Cir. 1977) (concluding that "[w]e perceive no limitation on the grant of powers to require immunization of legislative members from enforcement of federal criminal statutes."); De Vesa, 134 N.J. at 458 (concluding that "the validity of the exercise of senatorial courtesy . . . does not implicate the privilege accorded to legislators under the [New Jersey Constitution's] Speech and Debate Clause."); Gregorio, 188 N.J. Super. at 153 (concluding that "the submission of a financial disclosure statement does not constitute a part of the legislative or deliberative process protected by the [New Jersey] Constitution.")

Thus, whether the conduct or action of the legislator was legislative and related to business before the Legislative Branch, must be gauged by its nature and character, and not by the title or identity of the agent. Legislative Branch "'immunity is justified and defined by the function it protects and serves, not by the person to whom it attaches.'" Brown v. City of Bordentown, 348 N.J. Super. 143, 150 (App. Div. 2002) (quoting Forrester v. White, 484 U.S. 219, 227 (1987)). When a member of the Legislative Branch acts in an administrative or executive capacity, for political purposes, for their own perceived benefit, or with criminal intent, those communications and actions will not be immune from production or prosecution.

C. Court analysis

Embarking on an analysis of the Subpoena and the information sought thereunder, the court must first resolve a threshold issue. Is the Subpoena so narrowly tailored and limited in scope that it would exclude production by the OLS of any documents, communications, or materials that are an integral part of our Legislature's deliberative and communicative process? If the court finds that it is, then given the relevance of the information sought to plaintiffs' claims and the standard






of substantial liberality that our courts apply in affording access to information, the Subpoena should be upheld.

Conversely, if the Subpoena is so broadly written that it demands the production of information or materials that comprise part of the deliberative and communicative legislative process but may also seek information falling outside the sphere of legitimate legislative activity, the court bears an obligation to attempt to segregate and closely scrutinize the information sought. If the court's analysis reveals that the information is within the deliberative and communicative legislative process, the court must apply the Speech or Debate Clause preclusions and bar production of such information. However, if the court's analysis reveals that the information sought includes materials that involve political conduct, communications with non-legislative bodies on issues not related to the business before it, and/or communications with private entities or individuals, to which the Speech or Debate Clause may not apply, the court is permitted to conduct a further inquiry and/or demand the production of those materials.

Thus, contrary to the argument advanced by the OLS, the court does not find that its status as an agency of the Legislative Branch affords it wholesale immunity from the production of all documents. As expressed by our Appellate Division, the immunity afforded under the Speech or Debate Clause "is justified and defined by the function it protects and serves, not by the person to whom it attaches.'" Brown, 348 N.J. Super. at 150. Thus, pivotal to the court's inquiry is not the fact that the OLS is an agency of the Legislative Branch, rather the court must focus on the nature and character of the information being sought. If the information plainly constitutes legislative deliberative and communicative process materials, it will be insulated from production.

Moreover, contrary to plaintiffs' contentions, the court finds that it lacks the authority to command the OLS, as an agency of the Legislative Branch, to prepare and produce a privilege log






or "Vaughn index" for all materials in its possession. Rather, the documents, communications, and information sought that are unambiguously deliberative and communicative legislative process materials are constitutionally shielded under the Speech or Debate Clause from the court's authority. The Speech or Debate Clause affords the Legislative Branch immunity from furnishing those documents, including producing a privilege log of the documents and/or materials that are entitled to such immunity protections.

However, to the extent that any information and/or materials demanded from the OLS fall outside the sphere of legitimate legislative activity (information that involves political conduct, communications with non-legislative bodies not related to the business before it, and/or communications with private entities or individuals), the court may demand that such information be produced or direct that a privilege log or "Vaughn index" be provided to enable the parties and/or the court to evaluate the potential applicability of the Speech or Debate Clause protections. The court finds that such reasonable incursion, requiring an agency of the Legislative Branch to produce a privilege log for materials that may not be entitled to protection under the Speech or Debate Clause, does not violate our state's core constitutional separation of power principles.

Here, the court's review and analysis of plaintiffs' Subpoena discloses that it is broadly drafted and seeks certain information from the OLS that is unmistakably within the legislative sphere and legitimate scope of legislative activity. However, the Subpoena may also yield information related to political conduct, communications with non-legislative bodies not related to business before it, and/or communications with private entities or individuals. Accordingly, the court will individually address the information sought under each paragraph of the Subpoena.

1. Paragraph 1

Paragraph 1 of the Subpoena seeks "[a]ll documents that refer or relate to any






communications regarding [p]laintiffs." The legislative activity at issue in this matter involves the amendments implemented under A. 3088 to the New Jersey Gross Income Tax Act, and N.J.S.A. 54A:2-1. Thus, to satisfy the two-part test set forth under Gilbert, 87 N.J. at 293, for the Speech or Debate Clause immunity to attach to documents responsive to this inquiry, the activity: (i) must be an integral part of deliberative and communicative process that members of the New Jersey Senate and General Assembly engage in during committee proceedings; and (ii) must address legislation that is proposed or pending before New Jersey Senate or General Assembly, or is a matter that is within their constitutional jurisdiction.

In applying this test to the information sought under paragraph 1 of the Subpoena, the court is not clear how communications, if any, referencing the plaintiffs were or could be viewed as an integral part of our legislature's deliberative and communicative process in amending the New Jersey Gross Income Tax Act, or was related to any business before the Legislature. Further, the court is unclear why the plaintiffs' names would have been included in communications, if any, of proposed or pending legislation before the legislature. No argument has been advanced by the OLS that plaintiffs engaged in any activity or function that received public attention or scrutiny causing the New Jersey Senate or General Assembly to undertake responsive legislative action.

The court is mindful of the concern expressed by the United States Supreme Court that, compelling legislators to produce documents in "a private civil action . . . creates a distraction and forces [them] to divert their time, energy, and attention from their legislative tasks to defend the litigation." Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 503 (1975). However, when an agency of the Legislative Branch is in possession of documents, materials, or information that are relevant and probative of issues currently pending before the court that fall outside the scope of legitimate legislative activity, our courts have not been reluctant to compel their production.






Accordingly, the OLS' application seeking to quash paragraph 1 of the Subpoena is denied. Within ninety (90) days of the date hereof, the OLS shall furnish plaintiffs with documents or communications responsive to paragraph 1 under the Subpoena. If after a review of these materials, the OLS contends that all or any communications responsive to paragraph 1 under the Subpoena are within the sphere of legislative activity and insulated from production under the Speech or Debate Clause, the OLS shall produce a privilege log or "Vaughn index" for plaintiffs identifying the communication, communication date, the parties on the communication, and a brief summary of the communication. Within thirty (30) days thereafter the OLS may refile its motion to quash the Subpoena with respect to those communications, explaining why it believes such communication is within the sphere of legitimate legislative activity and should be entitled to protection under the Speech or Debate Clause.

If no responsive communications are found to exist, then within ninety (90) days of the date hereof, the OLS shall furnish plaintiffs with an affidavit of completeness reciting that after a diligent search no documents responsive to paragraph 1 under the Subpoena were identified by the OLS.

2. <u>Paragraphs 2, 3, 4, 5, 6, 7, 8, and 9</u>

The court finds that paragraphs 2, 3, 4, 5, 6, 7, 8, and 9 of the Subpoena seek documents, communications, or information that directly and unambiguously relate to the amendments enacted under A. 3088 to N.J.S.A. 54A:2-1 by our Legislature. These broadly drafted questions seek for the OLS to produce any document, communication, statement, memorandum, decision, and/or information related to: (i) any internal communications within the OLS, (ii) by and between the OLS and any member of the New Jersey Senate or General Assembly and/or its staff, or (iii) any research, calculations, or computations performed by the OLS for itself or for any member of the


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



New Jersey Senate or General Assembly. The court finds that these materials are clearly within the legislative sphere and are insulated from disclosure under the Speech or Debate Clause. Further, it would be overreaching by this court and an unnecessary encroachment on the Legislative Branch's independence to require that it produce a privilege log or "Vaughn index" for those documents, communications, statements, and materials that are so clearly and unmistakably within the realm of its legislative function.

Accordingly, the OLS' application seeking to quash paragraphs 2, 3, 4, 5, 6, 7, 8, and 9 of the Subpoena is granted without prejudice. However, plaintiffs may, if they so elect, serve an amended subpoena on the OLS that is more narrowly tailored and structured to exclude any documents or information that fall within the scope of legitimate legislative activity.

3.    Paragraphs 10, 11, and 12

Paragraphs 10, 11, and 12 of the Subpoena each seek documentation and information from the OLS with respect to its Legislative Fiscal Estimate and how it derived the estimated additional revenue that would be generated from A. 3088. Specifically, paragraph 10 of the Subpoena seeks:

> documents and communications that refer or relate to the OLS estimate that the increase in the marginal tax rate for income over $5 million from 8.97 percent to 10.75 percent . . . may yield additional gross income tax revenue of $293.7 million to $312.0 million in fiscal year 2019.

Paragraph 11 of the Subpoena seeks:

> documents and communications that refer or relate to the OLS estimate of additional gross tax revenue . . . derived from the 2015 data from the Statistics of Income published annually by the Department of the Treasury.

Paragraph 12 of the Subpoena seeks:

> documents and communications that refer or relate to [OLS'] statement in the Legislative Fiscal Estimate that 'incomes and tax

         

> liabilities for taxpayers at very high levels of income are subject to significant volatility from year to year because high-income taxpayers are more dependent on income sources that are more susceptible to changes in the economy, such as capital gains, employment bonuses, and certain types of business income.'

Thus, plaintiffs seek the documentation and information relied on by OLS in generating the calculations set forth under Legislative Fiscal Estimate, and seemingly intend to solicit from Mr. Neville, how those calculations were made. However, to appreciate the context of plaintiffs' demands, it is necessary to briefly discuss OLS' statutory obligations and what is a Legislative Fiscal Estimate.

When a bill is introduced in either the New Jersey "Senate or General Assembly . . . the bill shall be immediately reviewed by the Legislative Budget and Finance Officer in the Office of Legislative Services." N.J.S.A. 52:13B-6. If the LBFO determines that the "bill may . . . increase or decrease revenues of the State . . . , the [LBFO] shall immediately forward a request for a Fiscal Note to the Director of the Division of Budget and Accounting in the Department of the Treasury (Director). Ibid. Thus, the LBFO (in the legislative branch) must request from the Director (in the executive branch), a Fiscal Note. The Director is then responsible for forwarding the request for the Fiscal Note to the agency in the executive branch charged with carrying out the purpose of the legislation. N.J.S.A. 52:13B-7(a).

Within twenty business days after receipt of the request for a fiscal note, the "department, . . . or agency shall prepare and return to the [D]irector a fiscal note containing the most accurate estimate possible, in dollars, concerning the amount by which . . . revenues will be increased or decreased for the State." N.J.S.A. 52:13B-7(b). Within five business days of receipt of the Fiscal Note, the Director must forward the Fiscal Note, along with his or her statement "concurring with the fiscal note [or] suggesting alternative dollar amounts," to the LBFO. N.J.S.A. 52:13B-7(c).






Accordingly, the executive branch agency or department tasked with carrying out the legislation is responsible for generating the Fiscal Note and submitting it to the Director. The Director is then responsible for forwarding the Fiscal Note to the OLS and can either agree with the Fiscal Note of the executive branch agency or offer alternate values. Finally, after the OLS receives the Fiscal Note, including any comments from the Director, the LBFO may add his or her own comments regarding the accuracy of the Fiscal Note. N.J.S.A. 52:13B-8.

However, when the LBFO "has not received a fiscal note from the director by a date consistent with legislative consideration, the [LBFO] shall cause a legislative fiscal estimate to be produced by [OLS] as soon as practicable. The Legislative fiscal estimate shall contain the same information as would be included in a fiscal note." N.J.S.A. 52:13B-9. Notably, when no fiscal note has been received by the LBFO, the legislative fiscal estimate produced by the OLS must contain the statement, "[t]his legislative fiscal estimate has been produced by the Office of Legislative Services due to the failure of the Executive Branch to respond to our request for a fiscal note." Ibid.

Here, no fiscal note accompanied A. 3088. Instead, on September 28, 2018, approximately eighty-nine (89) days after A. 3088 passed the New Jersey Senate and General Assembly and was signed into law by the governor, the OLS produced a Legislative Fiscal Estimate Assembly Committee Substitute for Assembly, No. 3088 (the "Legislative Fiscal Estimate"). The Legislative Fiscal Estimate consists of six pages and its summary states, in part, that due to the "Higher Tax Rate on Income over $5 Million," there will be "State Revenue Increases" in Fiscal Year 2019 of "$293,700,000 to $312,000,000." The Legislative Fiscal Estimate further recites:

> OLS estimates that increasing the marginal gross income tax rate on income over $5 million from 8.97 percent to 10.75 percent may yield between $293.7 million and $312.0 million in additional State






revenue in FY 2019. The Executive estimates a $280.0 million FE to [1R] ACS for A3088 2 FY 2019 revenue gain. The OLS notes that incomes and tax liabilities for taxpayers at very high levels of income are volatile and subject to significant changes from year to year.

[Legislative Fiscal Estimate to Assembly Committee Substitute for A. 3088 3 (September 28, 2018).]

Further, the Legislative Fiscal Estimate states, in part, that:

The Executive has not submitted a formal, written fiscal note for this bill. However, information provided informally by the Executive indicated that the Department of the Treasury projected that the bill would increase FY 2019 State revenue collections by a net $156.8 million.

The 10.75 percent gross income tax rate on taxable income exceeding $5 million would raise an estimated $280.0 million in FY 2019: $255.0 million from the annualized impact of the new rate and $25.0 million in nonrecurring revenue attributable to the retroactive application of the tax rate increase to January 1, 2018. That revenue gain would be partially offset by a combined $123.2 million gross income tax revenue loss from the following initiatives: (1) increase the maximum property tax deduction amount from $10,000 to $15,000, $82.0 million; (2) expand the EITC, $27.2 million; and (3) establish the child and dependent care tax credit, $14.0 million. The Department of the Treasury did not specify the methods and data underlying its estimates.

The Executive did not forecast a FY 2019 gross income tax and corporation business tax revenue impact for the bill provisions related to the taxation of certain investment management services income because the enactment of the provisions would be contingent on Connecticut, Massachusetts, and New York enacting into law legislation having the identical effect and because litigation may further delay the entering into effect of the provisions.

[Id. (emphasis added).]

Thus, although the LBFO seemingly requested a fiscal note from the executive branch, in accordance with the statutory scheme, no formal fiscal note was generated by the New Jersey Department of the Treasury. Notably, the Legislative Fiscal Estimate offers no explanation how






OLS "informally" became aware of or acquired this projection from the Department of the Treasury, or whether any public data or information was received by the OLS from the executive branch supporting this informal communication.

Our statutes clearly and unambiguously impose an obligation on the OLS to review all bills introduced in the New Jersey Senate or General Assembly, and to solicit a fiscal note from the agency of the executive branch charged with responsibility for enforcing the legislation. See N.J.S.A. 52:13B-6. However, when the executive branch agency fails to respond, or does not timely respond, the OLS is charged with preparing a legislative fiscal estimate, as part of its duties as an agency of the legislative branch. See N.J.S.A. 52:13B-7, N.J.S.A. 52:13B-8; N.J.S.A. 52:13B-9. Therefore, the court finds that insofar that paragraphs 10, 11, and 12 of the Subpoena seek documents and/or communications: (i) that refer or relate to how the OLS estimated that the increased tax rate under A. 3088 will yield additional revenue of $293.7 million to $312.0 million in the 2019 fiscal year; (ii) that refer or relate to how the OLS estimated additional gross revenue derived from Statistics of Income published annually; and (iii) that refer or relate to the OLS' statement in the Legislative Fiscal Estimate regarding the volatility of the revenues, all that information was generated as part of OLS' statutory legislative function and thus, is within the legitimate sphere of legislative activities. Accordingly, it is immune from production under the Speech or Debate Clause.

Nonetheless, to the extent that paragraphs 10, 11, and 12 of the Subpoena seek documents and/or communications in possession of the OLS that comprise the "information provided informally by the Executive [Branch to the OLS which] indicated that the Department of the Treasury projected that the bill would increase FY 2019 State revenue collections by a net $156.8 million," the court finds such information may fall outside the sphere of legislative activity. The






court recognizes that if the executive branch agency tasked with enforcing the legislation adhered to the statutory scheme for furnishing a fiscal note, as identified under N.J.S.A. 52:13B-7, N.J.S.A. 52:13B-8, and N.J.S.A. 52:13B-9, such communications would be insulated from disclosure as legislative deliberative materials.

However, the motion record before the court is devoid of any evidence demonstrating how the executive branch "informally" communicated the information to the OLS, what the form this informal communication comprised, or whether any of this information was publicly available. The court questions whether this information was communicated through public speeches, press releases, or public comments to the legislation. As highlighted by the United States Supreme Court in Gravel, "Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies – they may cajole, and exhort with respect to the administration of a federal statute – but such conduct, though generally done, is not protected legislative activity." 408 U.S. at 625 (emphasis added). The court is unable to unequivocally conclude that any informal communication of this information by the executive branch agency to the OLS falls within the scope of legislative activity and is immune from production.

Accordingly, the OLS' application seeking to quash paragraphs 10, 11, and 12 of the Subpoena is granted, in part, and denied, in part. The motion is granted insofar that paragraphs 10, 11, and 12 of the Subpoena seek the OLS to produce documents and/or communications: (i) that refer or relate to the OLS estimate that the increased tax rate under A. 3088 will yield additional revenue of $293.7 million to $312.0 million in the 2019 fiscal year; (ii) that refer or relate to the OLS estimate of additional gross revenue derived from Statistics of Income published annually; and (iii) that refer or relate to the OLS' statement in the Legislative Fiscal Estimate regarding the volatility of the revenues, as such documents and/or communications are immunized






from production.

The motion is denied insofar that paragraphs 10, 11, and 12 of the Subpoena seek OLS to produce documents and/or communications in possession of the OLS that comprise the "information provided informally by the Executive [Branch to the OLS which] indicated that the Department of the Treasury projected that the bill would increase FY 2019 State revenue collections by a net $156.8 million." The OLS shall furnish plaintiffs, within ninety (90) days of the date hereof, any documents and/or communications in possession of the OLS responsive to the above inquiry as limited by the court.

Alternatively, if the OLS contends that any documents and/or communications, as limited above, responsive to paragraphs 10, 11, and 12 under the Subpoena are within the sphere of legislative activity and insulated from production under the Speech or Debate Clause, the OLS shall produce a privilege log or "Vaughn index" for plaintiffs identifying the communication, communication date, the parties to the communication, and a brief summary of the communication. Within thirty (30) days thereafter the OLS may refile its motion to quash the Subpoena with respect to those communications, explaining why it believes such communication is within the sphere of legitimate legislative activity and should be entitled to protection under the Speech or Debate Clause.

### 4. Testimony

Our court rules explicitly permit parties to "take the testimony of any person, including a party, by deposition upon oral examination." R. 4:14-1. Thus, a deposition will be permitted when the individual being deposed possesses personal knowledge or information which is "relevant to the subject matter involved in the pending action. . . ." R. 4:10-2(a). However, when the deposition seeks to solicit privileged or constitutionally protected information, or will cause "annoyance,






embarrassment, oppression, or undue burden or expense. . . ,” the party to be deposed can seek protection from the court upon a showing of “good cause.”  R. 4:10-3.  “Implicit in R. 4:10-3 is the notion that the movant bears the burden of persuading the court that good cause exists for issuing the protective order.”  Kerr, 295 N.J. Super. At 154-157 (citing D'Agostino v. Johnson & Johnson, 242 N.J. Super. 267, 281 (App. Div. 1990), rev’d on other grounds, 133 N.J. 516 (1993)).  Thus, the party from which discovery is being sought bears the burden of establishing why an order should be entered protecting it from the discovery demands.

The OLS emphasizes that Mr. Neville, as Legislative Counsel to the OLS, is “chief legal officer of the Legislature” and an employee of the legislative branch of our government.  N.J.S.A. 52:11-60.  As such, the OLS argues that the Speech or Debate Clause precludes Mr. Neville from being compelled to give deposition testimony related to any legislative activities.

A request to depose a member of the legislative branch of our government presents a tremendous potential for abuse, harassment, and intimidation.  As stated above, one of the core goals sought to be achieved by the framers of our state’s 1947 Constitution was to immunize members of the legislative branch from “any statement, speech or debate in either house or at any meeting of a legislative committee, they shall not be questioned in any other place.”  N.J. Const. art. IV, §4, ¶9.  Therefore, to gauge whether the deposition of Mr. Neville should proceed, the court must decide whether the purpose of the Subpoena is to elicit testimony from Mr. Neville concerning matters that are within the sphere of legislative activity and immunized under the Speech or Debate Clause.

Here, the record before this court demonstrates that plaintiffs seek to solicit testimony from Mr. Neville related to the enactment of A. 3088, the retroactive application of A. 3088, and how the OLS calculated the estimated revenues that would be derived from the amendments to N.J.S.A.






54A:2-1(a)(6).  Therefore, the court finds that the testimony sought from Mr. Neville is directly and inextricably related to his position as chief legal officer of our Legislature and within the sphere of legitimate legislative activity.  As such, Mr. Neville's testimony is insulated from being produced under the Speech or Debate Clause.  Accordingly, the court finds that the OLS has shown the requisite good cause, for entry of a protective order quashing the Subpoena insofar that it seeks to compel Mr. Neville's testimony.

### III.  Conclusion

Accordingly, for the above-stated reasons, the OLS' motion to quash the Subpoena is granted, in part, and denied, in part, without prejudice.

Very truly yours,


Hon. Joshua D. Novin

